UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEVON PAGE HARTMAN,

                Plaintiff,          Civil Action No. 18-12887
                                   Honorable Arthur J. Tarnow
    v.                         Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 13]

Plaintiff Devon Page Hartman ("Hartman") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying in part her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #12, #13), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I. RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Hartman was not disabled under the Act prior to August 13, 2017, is not supported by substantial evidence. Accordingly, the Court

recommends that the Commissioner's Motion for Summary Judgment (**Doc. #13**) be **DENIED**, Hartman's Motion for Summary Judgment (**Doc. #12**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

## II.    REPORT

### A.    Procedural History

After Hartman's applications for DIB and SSI were denied at the initial level (Tr. 206-11) and on reconsideration (Tr. 215-16, 235-36), she timely requested an administrative hearing, which was held on May 24, 2017, before ALJ JoErin O'Leary (Tr. 52-102).   Hartman, who was represented by attorney John Tsiros, testified at the hearing, as did her cousin, Richard Jewell, and vocational expert Susan Lyon.   (*Id.*).   On September 29, 2017, ALJ O'Leary issued a partially favorable written decision.   (Tr. 16-44).   Specifically, ALJ O'Leary concluded that Hartman was not disabled prior to August 13, 2017; however, she became disabled as of that date and continued to be disabled through the date of the decision.   (Tr. 43).   On July 23, 2018, the Appeals Council denied review.   (Tr. 1-6).   Hartman timely filed for judicial review of the final decision on September 14, 2018.   (Doc. #1).

## B.     Background

### 1.     *Hartman's Reports and Testimony*

Hartman was 45 years old as of her alleged onset date of May 3, 2013.  (Tr. 340).  She dropped out of high school but later earned her GED.  (Tr. 64, 346).  She worked in various jobs (including as an administrative clerk and an electric sign assembler) from September 1997 to December 2010, when her then-boyfriend "stalked" her on the job, appearing at her workplace to threaten her, and her employer decided it "didn't want the liability" associated with those actions.  (Tr. 68, 345, 349, 400, 415).  Subsequently, Hartman's boyfriend held her captive in their home in Texas, abusing her mentally and physically, and depriving her of food.  (Tr. 59, 63, 80-81).  Only with the help of family members was she rescued and returned to Michigan, weighing just 74 pounds at the time.  (Tr. 63-64, 93).  Hartman now alleges disability primarily as a result of anxiety, depression, and post-traumatic stress disorder ("PTSD"), as well as high blood pressure, kidney failure, an electrolyte imbalance, and breathing difficulties.  (Tr. 342, 357, 375, 380, 387).

At the time of the administrative hearing, Hartman testified that she doesn't sleep well, often doesn't bother getting dressed, often "zone[s] out," and is not even able to pay attention to a TV show.  (Tr. 77-78).  She has racing thoughts, cannot always remember what she was saying, and cannot retain information she reads.  (Tr. 78, 80).  She further testified that, for approximately 12-15 hours per day, she stays

3

in her bedroom and colors in adult coloring books, which helps calm her.  (Tr. 79).

> 2.  *The Relevant Medical Evidence*[1]

The earliest medical evidence in the record reveals that Hartman was hospitalized in Texas from June 22-26, 2010, when she overdosed on Tylenol PM after a fight with her abusive boyfriend.  (Tr. 482-88).  Twice in 2011, she presented to the hospital (once with a broken arm, and once with a concussion) after her daughter beat her.   (Tr. 489-97).   Other evidence indicates that Hartman was suffering from alcohol dependence[2] and its effects all the way through early 2015.  (Tr. 498-503 (presented to the emergency room in October 2011 with intractable nausea, vomiting, and dehydration after drinking "a lot" the night before), 667-79 (hospitalized from February 8-11, 2014 after suffering a seizure related to alcohol withdrawal), 581-95 (hospitalized from June 17-22, 2014 with severe alcohol intoxication/withdrawal and hyponatremia; "spousal abuse" noted)).

On June 30, 2014, Hartman's primary care physician (in Texas) prescribed Zoloft for her increasingly severe anxiety and depression, but at a follow-up visit two weeks later, she reported feeling like she was "falling apart" and that the Zoloft

---

[1] Because the Court finds error in the ALJ's evaluation of Hartman's mental functioning, it will focus its discussion on medical evidence pertaining to those impairments.  On remand, however, the ALJ should thoroughly re-evaluate all of the medical evidence, including that pertaining to both Hartman's mental and physical impairments.

[2] Indeed, at one hospital admission in October 2014, Hartman was shaking and had boils all over her body.  (Tr. 601).  She was counseled on alcohol cessation after admitting that she was drinking two bottles of vodka per day.  (Tr. 597, 601).

made her feel worse.  (Tr. 638-39).  On December 12, 2014, she was admitted to the

hospital with acute renal failure and possible suicidal ideations.  (Tr. 718).  A few

weeks later, she was again hospitalized with nausea, vomiting, and rectal bleeding,

reporting that she was depressed and drinking more vodka every day.  (Tr. 751).

On January 26, 2015, Hartman underwent a psychological examination with

Andrea Pellegrini, Psy.D.[3]  (Tr. 789-94).  She complained of depression and anxiety

but indicated that she did not have insurance and could not afford mental health

treatment.  (Tr. 790).  When asked about her current symptoms, Hartman reported:

> [D]aily crying spells, loss of interest, persistent sadness,
> withdraws and isolates, psychomotor and cognitive slowing,
> "unable to think straight," unable to focus, easily forgetful,
> "sleeps all day," persistent fatigue, poor appetite with weight
> loss, low energy level, feelings of helplessness, hopelessness and
> worthlessness, thoughts of death, ruminative, negative thought
> process, thoughts of impending doom, anxiety, nervousness,
> shakes, feels dizzy, experiences shortness of breath, feels weak,
> bites nails and skin, scratches skin, hives given anxiety, feels
> "stuck," feels "like she's drowning," feels unsafe, feels fearful,
> does not like to leave home, and "wants to escape," with a sense
> of urgency.

(*Id.*).  Although Hartman told Dr. Pellegrini several times that she was "not suicidal,"

she did admit to some suicidal ideation the week before, "which frightened her."

(*Id.*).  On mental status examination, she was visibly in "significant distress … often

---

[3] Around this same time, Hartman underwent a physical examination with Farzana Sahi, M.D.  (Tr. 777-80).  In the course of his physical examination, Dr. Sahi noted that Hartman had a history of alcohol abuse, severe anxiety, and depression and opined that she had unspecified restrictions "based on her psychological disorder."  (*Id.*).

5

shaking and crying." (Tr. 792). She was unable to interpret proverbs correctly, her mood appeared significantly depressed, and her affect was tearful, but her concentration and attention appeared "adequate" and her judgment "fair." (Tr. 792-93). In relevant part, Dr. Pellegrini diagnosed Hartman with major depressive disorder (recurrent, severe, without psychosis) and generalized anxiety disorder. (Tr. 794). She characterized Hartman's prognosis as "guarded" and then opined:

> Devon presented as overwhelmed and distressed due to multiple stressors to include an abusive relationship. She indicated she lost her job given her medical issues. However, aside from physical limitations, she does not appear capable from a psychological perspective of working adequately within a competitive work environment. She seemed highly preoccupied and thus cannot likely sustain concentration and persist in work-related activity at a reasonable pace at this time.

(*Id.*).

On February 15, 2015, state agency psychologist Michele Chappuis, Ph.D., reviewed Hartman's records and completed a Mental Residual Functional Capacity ("RFC") Assessment and a Psychiatric Review Technique. (Tr. 141-48). Dr. Chappuis noted that Hartman suffered from an affective disorder (as defined in Listing 12.04) and a substance addiction disorder (as defined in Listing 12.09). (Tr. 142-43). Nevertheless, Dr. Chappuis opined that Hartman was able to carry out routine 1-2 step tasks, respond to ordinary changes in the workplace, interact with others, and maintain focus on basic activities. (Tr. 146).

On July 2, 2015, Hartman underwent a consultative psychological evaluation

with Michael Brady, Ph.D.[4]  (Tr. 796-800).  She reported anxiety and depression, low energy, fatigue, lack of appetite, tachycardia, shaking, trouble sleeping, uncontrolled itching, nausea, and crying.  (Tr. 796).  She indicated that she did not leave her house and did not like to be around people or commotion.  (*Id.*).  She reported having been married twice – first to a man who was abusive, and then to a police officer who was shot in the line of duty.  (Tr. 797).  Dr. Brady indicated that the results of Hartman's mental status examination "revealed mild abnormalities in concentration, general knowledge, memory, judgment, abstract reasoning, and calculation tasks"; that she met the criteria for depressive disorder and anxiety disorder; and that her prognosis was poor.  (Tr. 799).  With respect to Hartman's functional limitations, Dr. Brady opined as follows:

> Her ability to relate and interact with others, includ[ing] coworkers and supervisors, is somewhat impaired especially during flare ups.  She was occasionally tearful throughout the evaluation.  Her depression and anxiety could affect her interpersonal relationships in the workplace especially during flare ups.  Her ability to understand, recall and complete tasks and expectations does appear to be significantly impaired especially during flare ups.  She is able to perform simple tasks with no major limitations.  She struggled with tasks that have multiple steps and increased complexity.  Her ability to maintain concentration does seem somewhat impaired especially during flare ups.  As a result [o]f her emotional state she may often be distracted and her effectiveness and performance will likely be

---

[4] The same day, Hartman presented for a consultative physical examination with James Brasseur, D.O.  (Tr. 802-04).  At the conclusion of his report, Dr. Brasseur characterized Hartman's physical status as "quite stable" but then stated, "What she is in need of, in my judgment, is a psychological evaluation."  (Tr. 804).

limited and slowed.  Her ability to withstand the normal stressors associated with a workplace setting is somewhat impaired.

(*Id.*).

Shortly thereafter, on July 20, 2015, Bruce Douglass, Ph.D., reviewed Hartman's updated records and completed a second Mental RFC Assessment and Psychiatric Review Technique.  (Tr. 164-81).  Dr. Douglass noted that Hartman suffered from an affective disorder (as defined in Listing 12.04), an anxiety-related disorder (as defined in Listing 12.06), and a substance addiction disorder (as defined in Listing 12.09).  (Tr. 173).  Dr. Douglass then opined that Hartman was mildly limited in her activities of daily living, and moderately limited in both social functioning and maintaining concentration, persistence, and pace.  (*Id.*).  Dr. Douglass further opined that Hartman was able to carry out routine 1-2 step tasks on a sustained basis.  (Tr. 178).

In August 2015, Hartman's new primary care physician (in Michigan) referred her to Behavioral Health at Great Lakes Bay Health Centers.  (Tr. 1915).  Again, she reported symptoms of depression, anxiety, poor concentration, sadness, withdrawal, fatigue, and difficulties with thinking and memory.  (*Id.*).  At her initial psychiatric evaluation with Ali Ibrahim, M.D., she had labile mood and affect and was difficult to interview due to her anger and intensity.  (Tr. 1920).  She was diagnosed with major depression (recurrent, severe); her Paxil dose was increased; and trazodone and Vistaril were started.  (Tr. 1922).  At her next visit to Dr. Ibrahim, on September

8

14, 2015, Hartman reported increased feelings of depression and insomnia; her mood was depressed; and her affect was constricted. (Tr. 1924). Wellbutrin was added to her medication regimen. (Tr. 1925). On October 12, 2015, Dr. Ibrahim noted a depressed and irritable mood and blunted affect, and her Wellbutrin dose was increased. (Tr. 1930-31).

At her next visit to Dr. Ibrahim, Hartman reported having just been hospitalized for hyponatremia, which her nephrologist believed could be due in part to her psychiatric medications. (Tr. 1937). On examination, her mood was anxious, she had increased psychomotor tone, and her affect was blunted. (*Id.*). Paxil was discontinued, and clonazepam and Lexapro were added. (Tr. 1937-38). On December 14, 2015, Hartman reported having been unable to obtain two of her medications, and she presented with a depressed mood and blunted affect. (Tr. 1943). On February 15, 2016, Dr. Ibrahim noted that Hartman was "socially isolated," with poor memory and decreased attention and concentration. (Tr. 1949). Lexapro was discontinued, and Brintellix was started. (*Id.*). At an April 4, 2016 mental status examination, Hartman's mood was irritable and her affect blunted; Brintellix was switched to vilazodone. (Tr. 1956). Throughout all of these visits, Hartman's depression was categorized as "severe," and her treatment response ranged from "possibly inadequate" to "inadequate." (Tr. 1936, 1942, 1948, 1955).

In May 2016, Hartman continued to complain of depressed mood and

irritability; her affect was blunted; and vilazodone was changed to Rexulti. (Tr. 1959). On June 1, 2016, Hartman reported that Rexulti was helpful, and her dose was increased. (Tr. 1962). At her next visit, on August 1, 2016, Hartman reported that her medications were "partially helpful," but she continued to suffer from depression; her affect was blunted; and Dr. Ibrahim again increased her Rexulti dose. (Tr. 1965).

From September 22-27, 2016, Hartman was admitted to Covenant Hospital after her blood pressure spiked during a dentist appointment, and she was diagnosed with hypertension and acute hyponatremia. (Tr. 1303). A psych consult was performed by Maryam Davari, M.D., and Hartman admitted feeling depressed and alone, with mood swings and tearful episodes. (*Id.*). She further reported feelings of hopelessness and persistent passive suicidal thoughts. (*Id.*). On mental status examination, her mood was sad, depressed, hopeless, and overwhelmed; her affect was reactive and appeared elevated/mood incongruent at times; her thought processes were circumstantial at times; and she had impaired short-term memory. (Tr. 1308). Dr. Davari believed Hartman should receive inpatient psychiatric care, feeling it was unsafe for her to return home given her suicidal thoughts, but Hartman refused. (Tr. 1309-10). Her medications were again changed, with Abilify and Seroquel being added. (Tr. 1310).

At her next three follow-up visits to Dr. Ibrahim, between October 2016 and

January 2017, Hartman generally reported "doing fine" on her current cocktail of medications, which then included Abilify, Seroquel, clonazepam, Vistaril, and trazodone.  (Tr. 1973, 1976, 1981).  In March 2017, however, she had a slightly anxious mood and blunted affect, and Seroquel was discontinued because of "oversedation."  (Tr. 1984).  At her next visit, in May 2017, Hartman's mood was angry and irritable, with congruent affect, and her medications were again changed (tapering down on clonazepam and adding Zoloft and Ambien).  (Tr. 1988).

On June 30, 2017, Hartman's treating therapist, Sharrhonda Brown, who worked with Dr. Ibrahim at Great Lakes Bay Health Centers, completed a Mental RFC Assessment.  (Tr. 2001-05).  Ms. Brown opined that Hartman was *markedly* limited in numerous respects, including the ability to remember locations and work-like procedures; understand, remember, and carry out both simple and detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and work week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers

or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation.  (Tr. 2001-02).  Ms. Brown further opined that Hartman was *moderately* limited in several other areas, including the ability to interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others.  (Tr. 2002).  Ms. Brown further explained:

> [Hartman] carries a diagnosis of Major, Depression, recurrent, severe ….  [She] struggles with attending to her [activities of daily living] on a daily basis and getting out of bed throughout the week.  [She] is reminded about these things usually by family members.  [Her] symptoms include depressed mood, anxiety, insomnia, crying, weight gain, isolating and problems with being forgetful.  [She] continues to experience depression even with efforts of therapy and multiple trials of psychotropic medications changes and dosages.

(Tr. 2005).

## C.   The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

12

continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

13

Following this five-step sequential analysis, the ALJ found that Hartman was not disabled under the Act between May 3, 2013, and August 13, 2017.[5]  At Step One, the ALJ found that Hartman has not engaged in substantial gainful activity since May 3, 2013.  (Tr. 20).  At Step Two, the ALJ found that she has the following severe impairments:  gastritis, hypertension, hyponatremia, chronic kidney disease stage III, fibromyalgia, headaches with a history of seizure and abnormal brain MRI, lumbar degenerative disease, chronic obstructive pulmonary disease, congestive heart failure, osteoarthritis of the bilateral knees, depression, anxiety, PTSD, and substance abuse.  (*Id.*).  At Step Three, the ALJ found that Hartman's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 22-23).

The ALJ then assessed Hartman's RFC, concluding that she is capable of performing sedentary work, with the following additional limitations:  can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but can never climb ladders, ropes, or scaffolds; can never be exposed to unprotected heights or dangerous moving mechanical parts; can tolerate occasional exposure to dust, odors, fumes, and pulmonary irritants; can understand, remember, and carry

---

[5] Previously, on May 2, 2013, ALJ Ray McQuary issued a partially favorable written decision finding that Hartman was disabled from May 19, 2011, to November 14, 2012, and was no longer disabled after November 14, 2012.  (Tr. 120-30).  Thus, ALJ O'Leary considered Hartman's disability applications beginning May 3, 2013, the day after the prior decision.  (Tr. 17).

out simple instructions not requiring a specific production rate; can make simple work-related decisions; and can occasionally deal with supervisors and co-workers, but cannot deal with the general public. (Tr. 26).

At Step Four, the ALJ found that, since May 3, 2013, Hartman has not been capable of performing any of her past relevant work. (Tr. 41). At Step Five, the ALJ determined, based in part on testimony provided by the vocational expert in response to hypothetical questions, that, prior to August 13, 2017, Hartman was capable of performing the jobs of bench assembler (42,000 jobs nationally), packager (23,000 jobs), and inspector (13,000 jobs). (Tr. 42). As a result, the ALJ concluded that prior to August 13, 2017, when Hartman's age category changed and she became disabled pursuant to Medical-Vocational Rule 201.14, she was not disabled under the Act. (Tr. 43).

### D.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). Substantial evidence is "more than a scintilla of

evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of*

*Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

### E.    Analysis

In her motion for summary judgment, Hartman argues that the ALJ erred in her weighing of various medical opinions of record and that, as a result, her decision is not supported by substantial evidence.[6]  Specifically, as set forth above, the record contains seven medical opinions:  an opinion from Hartman's treating therapist (Ms. Brown); four opinions from examining sources (Drs. Pellegrini, Brady, Brasseur, and Sahi); and two opinions from non-examining sources (Drs. Chappuis and Douglass).  Broadly stated, all five of the treating/examining providers opined that Hartman's mental impairments would greatly limit her ability to maintain full-time employment.  The ALJ rejected these opinions in all crucial respects.  On the other hand, both state agency physicians – neither of whom examined Hartman – opined that she could perform routine 1-2 step tasks on a sustained basis.  The ALJ gave both of these opinions great weight.  For the reasons set forth below, the Court finds that the ALJ erred in evaluating the medical opinions of record and that, as a result, remand is required.

---

[6] Hartman raises several other issues before this Court, arguing, *inter alia*, that in formulating her RFC, the ALJ failed to consider the combined effect of her impairments; that the ALJ erred in evaluating her subjective complaints; and that the ALJ erred in concluding that she does not meet or medically equal Listing 12.04.  (Doc. #12 at 18-25).  Because the Court is recommending remand on other grounds, it need not discuss in detail the merits of these arguments.  On remand, however, the ALJ should give full and fair consideration to each of these issues.

> ### 1.   *Treating and Examining Source Opinions*
>
> #### a.   *Dr. Pellegrini's Opinion*

As set forth in greater detail above, Dr. Pellegrini examined Hartman on January 26, 2015, noting that she was visibly in "significant distress … often shaking and crying." (Tr. 792). Dr. Pellegrini diagnosed Hartman with major depressive disorder, characterized her prognosis as "guarded," and then opined that she "does not appear capable from a psychological perspective of working adequately within a competitive work environment. She seemed highly preoccupied and thus cannot likely sustain concentration and persist in work-related activity at a reasonable pace at this time." (Tr. 794).[7]

The ALJ considered Dr. Pellegrini's opinion but gave it little weight, reasoning as follows:

> This opinion appears to be based on [Hartman's] temporary life stressor of living with an alleged abusive and controlling boyfriend and [her] preoccupation with this during the consultative examination [citing Tr. 794]. [Hartman] did not

---

[7] In 2015, Hartman also underwent consultative examinations with Drs. Sahi and Brasseur. (Tr. 777-80, 802-04). Although both of these physicians examined Hartman from a *physical* perspective, it bears mentioning that each observed significant mental limitations just in the short time they spent with her. Specifically, Dr. Sahi opined that Hartman had unspecified restrictions "based on her psychological disorder." (Tr. 780). And, while Dr. Brasseur characterized Hartman's physical status as "quite stable," he then stated, "What she is in need of, in my judgment, is a psychological evaluation." (Tr. 804). The ALJ gave both of these opinions little weight, primarily because they were "commissioned to assess [Hartman's] physical condition," and because they do "not state what restrictions [Hartman] actually has." (Tr. 38). Although these observations are correct, it is noteworthy that two physicians who were called on to opine as to Hartman's physical limitations both concluded – after just a short time with Hartman – that her mental impairments were so obvious and significant as to require further evaluation.

> even report this situation to Dr. Brady when he evaluated [her]
> in July 2015, which was after she moved away from her
> boyfriend and stopped using alcohol …. I give more weight to
> the opinion of Dr. Brady who evaluated [her] when she was not
> under the stressors of her relationship and alcohol.

(Tr. 40).[8]  This analysis is problematic for multiple reasons.  First, the ALJ appears

to have minimized the ongoing psychological issues stemming from the terror of

living for years with an abusive and controlling boyfriend, mischaracterizing this

trauma as "temporary" in nature.  (*Id.*).  While the ALJ might be correct that Dr.

Brady's report does not specifically reference this domestic situation, the inference

the ALJ draws – that Hartman had apparently recovered from this ordeal – is simply

not supported by the evidence.  Indeed, throughout 2015, 2016, and 2017, Hartman's

diagnoses included PTSD (Tr. 922, 1302, 1309, 1678, 1947, 1951, 1958, 1960, 1963,

1967, 1974, 1977, 1982), demonstrating that she continued to suffer the effects of

that violent situation, and there are multiple references to the abuse she suffered at

the hands of her ex-boyfriend long after Dr. Pellegrini's January 2015 examination

---

[8] The ALJ also discounted Dr. Pellegrini's opinion because the "ultimate issue of disability is reserved to the Commissioner."  (Tr. 40).  This general legal principle is accurate.  *See Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016) (finding that the "ALJ reasonably gave no weight to [the doctor's] opinion because her conclusion that [the plaintiff] is totally disabled is a determination reserved to the Commissioner").  Here, however, Dr. Pellegrini did not merely opine that Hartman was "totally disabled" or "unable to work"; rather, she further observed that Hartman "seemed highly preoccupied and thus cannot likely sustain concentration and persist in work-related activity at a reasonable pace at this time."  (Tr. 794).  It is not appropriate to discount an opinion in its entirety simply because, in addition to otherwise valid medical opinions, it also contains a statement that goes to the ultimate issue of disability.  *See Ebel v. Comm'r of Soc. Sec.*, No. , 2017 WL 4928651, at *7 (E.D. Mich. July 24, 2017) (ALJ properly discounted the portion of physician's opinion in which he determined the plaintiff was totally disabled and unable to work).

(Tr. 921, 1302, 1461, 1915, 1920).  Moreover, the ALJ purports to give "more weight to the opinion of Dr. Brady who evaluated [her] when she was not under the stressors of her relationship and alcohol."  (Tr. 38).  In reality, the ALJ gave great weight to only *one aspect* of Dr. Brady's opinion (that Hartman could perform simple tasks), while reasoning that the many other aspects of his opinion were "inconsistent with the other substantial evidence in the record."  (Tr. 38).  As discussed *infra* at 20-22, this conclusion itself is erroneous, thus further undermining the ALJ's decision to discount Dr. Pellegrini's opinion in favor of Dr. Brady's.  For these reasons, the ALJ's decision to give little weight to Dr. Pellegrini's opinion is not supported by substantial evidence.

### b.    Dr. Brady's Opinion

As the ALJ recognized, Dr. Brady examined Hartman on July 2, 2015, noting that she met the criteria for depressive disorder and anxiety disorder, and characterizing her prognosis as poor.  (Tr. 799).  With respect to Hartman's functional limitations, Dr. Brady opined:

> Her ability to relate and interact with others, includ[ing] coworkers and supervisors, is somewhat impaired especially during flare ups.  She was occasionally tearful throughout the evaluation.  Her depression and anxiety could affect her interpersonal relationships in the workplace especially during flare ups.  Her ability to understand, recall and complete tasks and expectations does appear to be significantly impaired especially during flare ups.  She is able to perform simple tasks with no major limitations.  She struggled with tasks that have multiple steps and increased complexity.  Her ability to maintain

concentration does seem somewhat impaired especially during flare ups.  As a result [o]f her emotional state she may often be distracted and her effectiveness and performance will likely be limited and slowed.  Her ability to withstand the normal stressors associated with a workplace setting is somewhat impaired.  (*Id.*).

(*Id.*).  The ALJ regurgitated these aspects of Dr. Brady's opinion and then purported to give the opinion great weight, but only to the extent it supports a conclusion that Hartman "can perform simple tasks with social limitations."  (Tr. 38).

The ALJ appears to have rejected the remainder of Dr. Brady's opinion as "inconsistent with the other substantial evidence in the record."  (*Id.*).  But, these aspects of Dr. Brady's opinion, all of which support Hartman's claims of disability, are quite specific in nature and are supported by substantial evidence in the record, as discussed above (*i.e.*, her ability to "understand, recall and complete tasks and expectations," "maintain concentration," and "withstand the normal stressors associated with a workplace setting" all appear to be "significantly impaired[.]") (Tr. 799).  These abilities, as well as the fact that Hartman may often be distracted – and her effectiveness and performance limited and slowed – as a result of her mental state are all facts of critical importance in determining whether she can perform "simple tasks" on a sustained basis in the workplace setting.

In sum, rather than acknowledging and addressing the significant evidence supporting these aspects of Dr. Brady's opinion, the ALJ simply parroted back *one* of Dr. Brady's conclusions – that she can "perform simple tasks" – without any

consideration of whether she can do so on a sustained basis, given her documented deficiencies in attention, concentration, memory, persistence, and difficulties interacting with others. The Court recognizes that an ALJ need not address every piece of evidence in the record, *Kornecky*, 167 F. App'x at 508, but she does not fairly discharge her duties when she fails to discuss significant contradictory portions of the very records on which she relies the most. *See Minor v. Comm'r of Social Sec.*, No. 12-1268, 2013 WL 264348, at *17 (6th Cir. Jan. 24, 2013) (citing *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008) and *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011)). Here, it is one thing to adopt Dr. Brady's opinion that Hartman can "perform simple tasks"; it is another thing entirely to conclude that she can do so on a full-time basis without any discussion of the ways in which her mental deficiencies – including the "ability to understand, recall and complete tasks," "maintain concentration," and "withstand the normal stressors associated with a workplace setting" – affect her ability to perform simple tasks *on a sustained basis in the workplace*. Thus, the Court finds that the ALJ erred in weighing Dr. Brady's opinion.

c.  *Ms. Brown's Opinion*

The ALJ also evaluated the June 2017 Mental RFC Assessment completed by Hartman's treating therapist, Ms. Brown, giving "some weight" to Ms. Brown's opinion that Hartman has "some moderate limitations in her mental functioning."

22

(Tr. 39-40).   But, Ms. Brown also articulated several other opinions regarding Hartman's mental limitations; specifically, that she is *markedly* limited in numerous respects, including the ability to remember locations and work-like procedures; understand, remember, and carry out both simple and detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and work week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation.   (Tr. 2001-02).   The ALJ rejected these aspects of Ms. Brown's opinion because they were "not supported by treatment records, which show [Hartman] has symptoms but few abnormalities on her mental status examinations" and because she underwent "relatively conservative treatment with psychotropic medication and therapy."   (Tr. 39).

In this area too, the ALJ impermissibly focused on only the portion of the

record that supports her conclusions while failing to adequately address other
significant record evidence which detracts from those conclusions. *See Trudell ex
rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("'Substantiality
of the evidence must be based upon the record taken as a whole.   Substantial
evidence is not simply some evidence, or even a great deal of evidence.   Rather, the
substantiality of evidence must take into account whatever in the record fairly
detracts from its weight.'") (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir.
1984)); *see also Laskowski v. Apfel*, 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000)
(substantial evidence "cannot be based on fragments of the record").   For example,
the ALJ noted that, at several visits to Dr. Ibrahim, Hartman "was cooperative, her
insight and judgment were good, and she had no hallucinations, delusions, or
suicidal or homicidal thinking."  (Tr. 39 (citing Tr. 1930, 1937, 1943, 1959, 1962,
1965, 1973, 1976, 1981, 1984, 1988)).   But, at many of these same visits, Dr. Ibrahim
also noted a depressed and/or anxious and/or irritable mood and blunted or
constricted affect.  (Tr. 1930, 1937, 1943, 1959, 1965, 1984, 1988).   Similarly, the
ALJ noted that, at some doctor's visits, Hartman "stated that she was doing fine on
her current medications and denied side effects[.]"  (Tr. 39-40 (citing Tr. 1973, 1976,
1981)).   But, during this time frame, Hartman's treating physicians were trying
numerous medications, at ever-increasing doses, without success, including Paxil,
trazodone, Vistaril, Wellbutrin, clonazepam, Lexapro, Brintellix, vilazodone,

24

Rexulti, Abilify, Seroquel, Zoloft, and Ambien.[9]  (Tr. 1310, 1922, 1925, 1930-31, 1937-38, 1949, 1959, 1962, 1965, 1988).  In sum, where the ALJ relied on certain fragments of the record in discounting Ms. Brown's opinion, while simultaneously ignoring competing evidence, her decision to discount that opinion is not supported by substantial evidence.

## 2.    *Non-Treating and Non-Examining Source Opinions*

Hartman also challenges the ALJ's decision to give great weight to the opinions of the state agency consultants that Hartman was "able to carry out routine 1-2 step tasks."  (Tr. 38-39, 146, 178).  As the Commissioner correctly points out, opinions from non-examining state agency psychologists "may be entitled to significant weight, because these individuals are 'highly qualified' and are 'experts in Social Security disability evaluation.'"  *Cobb v. Comm'r of Soc. Sec.*, No. 12-2219, 2013 WL 5467172, at *5 (N.D. Ohio Sept. 30, 2013) (quoting 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i)).   Indeed, "'[i]n appropriate circumstances, opinions from State agency medical and psychological consultants … may be entitled to greater weight than the opinions of treating or examining sources.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013) (quoting *Soc.*

---

[9] To the extent the ALJ discounted Ms. Brown's opinion because Hartman received "relatively conservative treatment with psychotropic medication and therapy" (Tr. 39), the Court notes that *at least* thirteen different medications were tried, with little to no success.  And, in September 2016, inpatient psychiatric treatment was recommended.  (Tr. 1309-10).

*Sec. Rul. 96-6p*, 1996 WL 374180, at *3 (July 2, 1996).

Here, however, the reasons articulated by the ALJ for crediting the opinions of Dr. Chappuis and Dr. Douglass over those of Hartman's treating and examining sources are not supported by substantial evidence.  First, the ALJ afforded these opinions great weight because they are "grounded in the evidence in the case record" (Tr. 38, 39), but, for the reasons set forth in detail above, *supra* at 4-12, 18-25, that statement is not a fair characterization of the record.

Additionally, the ALJ credited Drs. Chappuis' and Douglass' opinions, which were issued in January and July 2015, respectively, because she found that evidence later received into the record "did not provide any new or material information that would alter any findings about [Hartman's] ability to carry out simple tasks …." (Tr. 38-39).  This finding also lacks support.  Specifically, at the time Drs. Chappuis and Douglass rendered their opinions, the record contained *no evidence of mental health treatment whatsoever.*  Subsequently, however, Hartman obtained insurance and sought treatment, generating hundreds of pages of medical records.  Indeed, from August 2015 through May 2017, her treating psychiatrist routinely observed a depressed and/or anxious and/or irritable mood and blunted or constricted affect. (Tr. 1924-25, 1930, 1937, 1943, 1956, 1959, 1965, 1984, 1988).  Several medications were tried at different dosages without success, including Paxil, trazodone, Vistaril, Wellbutrin, clonazepam, Lexapro, Brintellix, vilazodone,

Rexulti, Abilify, Seroquel, Zoloft, and Ambien.  (Tr. 1310, 1922, 1925, 1930-31, 1937-38, 1949, 1959, 1962, 1965, 1988).  And, notably, in September 2016, Dr. Davari, a psychiatrist at Covenant Hospital, opined that it was unsafe for Hartman to return home, given her recurring suicidal thoughts, and recommended she receive inpatient psychiatric care.  (Tr. 1309-10).  Simply put, the ALJ erred in finding that the medical evidence post-dating the state agency psychologists' opinions "did not provide any new or material information …."  (Tr. 39).

### 3.    Summary

For all of the reasons set forth above, the Court simply cannot find that the ALJ's decision is supported by substantial evidence.  The record contains five opinions from treating or examining sources, all of whom opined that Hartman was significantly limited by her psychological impairments in a way that would materially negatively impact her ability to perform work on a sustained basis.  The ALJ rejected all five of these opinions in favor of those of two state agency psychologists, both of which were rendered after a mere review of Hartman's then-existing records, which was long before the bulk of her mental health treatment notes were generated.  The Commissioner characterizes the ALJ's decision in this case as "particularly detailed and judicious" (Doc. #12 at 6), but it is not enough for an ALJ to recite many "details" from the records; rather, she must ensure that the evidence is considered fairly and in its entirety, rather than simply cherry-picking portions of

the record that support the desired conclusion. *See Trudell*, 130 F. Supp. 2d at 895 ("'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, **or even a great deal of evidence**. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'") (emphasis added) (quoting *Garner*, 745 F.2d at 388). Because the ALJ's evaluation of the opinion evidence tainted her RFC finding – and, potentially, her conclusion at Step Three that Hartman does not meet or medically equal Listing 12.04 – the Court recommends remand.

## III.   CONCLUSION

For these reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #13**) be **DENIED**, Hartman's Motion for Summary Judgment (**Doc. #12**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

Dated: July 2, 2019                         s/David R. Grand
Ann Arbor, Michigan                     DAVID R. GRAND
                                                     United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections

28

to the proposed findings and recommendations and the order set forth above.  *See* 28

U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to

timely file objections constitutes a waiver of any further right of appeal.  *See Thomas*

*v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir.

2005).   Only  specific  objections  to  this  Report  and  Recommendation  will  be

preserved for the Court's appellate review; raising some objections but not others

will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co.*

*v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be

served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being

served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such

response should be concise, and should address specifically, and in the same order

raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The  undersigned  certifies  that  the  foregoing  document  was  served  upon
counsel of record and any unrepresented parties via the Court's ECF System to their
respective  email  or  First  Class  U.S.  mail  addresses  disclosed  on  the  Notice  of
Electronic Filing on July 2, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
